**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF WISCONSIN**

**UNITED STATES OF AMERICA**
        **Plaintiff,**

  v.                                                                                   Case No. 17-CR-226

**ALBERTO FERNANDEZ RAMIREZ and**
**ANA DELIA DOMINGUEZ**
        **Defendants.**

## DECISION AND ORDER

The government charged husband and wife defendants Alberto Fernandez Ramirez and Ana Delia Dominguez with participating in a tax refund scheme. Defendants filed motions to suppress evidence obtained from their home, Dominguez's business, and a storage unit pursuant to search warrants, arguing that the warrants were not supported by probable cause. The magistrate judge handling pre-trial proceedings in this case reviewed the warrant applications, then issued a recommendation that the motions be denied. Specifically, she concluded that the warrants were supported by probable cause and even if they were not the agents could have relied in good faith on the issuing judge's probable cause determination. Defendants object to the recommendation, so I must review the matter de novo. See Fed. R. Crim. P. 59(b).

**I.**

Search warrants may issue only on a showing of probable cause, supported by oath or affirmation, and particularly describing the place to be searched and the persons or things to be seized. U.S. Const. amend. IV. Where, as here, an affidavit is the only evidence presented

in support of a search warrant, the validity of the warrant depends solely on the strength of the affidavit. United States v. Johnson, 867 F.3d 737, 741 (7th Cir. 2017).

"Probable cause exists when the supporting affidavit presents a total set of circumstances which create a 'fair probability' that a search will uncover evidence of a crime." United States v. Haynes, 882 F.3d 662, 665 (7th Cir. 2018). When the information used to support a finding of probable cause comes from informants, the legitimacy of a probable cause determination turns on the informants' reliability, veracity, and basis of knowledge. When assessing an informant's credibility, the issuing judge should consider the degree of police corroboration, the informant's first-hand knowledge, the detail provided, the time between the reported events and the warrant application, and whether the informant appeared before the judge. Id.

The reviewing court gives great deference to the issuing judge's decision that the facts add up to probable cause. United States v. Hansmeier, 867 F.3d 807, 811 (7th Cir. 2017). The court will uphold the warrant if substantial evidence in the record supports the issuing judge's conclusion. Id. Doubtful cases should be resolved in favor of upholding the warrant. United States v. Quintanilla, 218 F.3d 674, 677 (7th Cir. 2000).

Even if the reviewing court finds the warrant deficient, the evidence is nevertheless admissible if the agents conducting the search relied in good faith on the magistrate's decision to issue the warrant. Edmond v. United States, 899 F.3d 446, 451 (7th Cir. 2018). An agent's decision to obtain a warrant is prima facie evidence that he acted in good faith. United States v. Searcy, 664 F.3d 1119, 1124 (7th Cir. 2011). The defendant can rebut the presumption of good faith only by showing that the issuing judge abandoned his detached and neutral role, the agent was dishonest or reckless in preparing the affidavit, or the warrant was so lacking in

probable cause as to render the agent's belief in its existence entirely unreasonable. Id.

**II.**

On May 22, 2017, IRS Special Agent Park Jones applied for warrants to search defendants' residence on South 13th Street in Milwaukee (a duplex) and Dominguez's business on West Lincoln Avenue in Milwaukee. (R. 30-1, 30-2, 31-1.)[1] Jones averred that based on online property records defendants own the S. 13th Street residence and that according to online corporate records Dominguez is the registered agent for the business located on W. Lincoln Ave. (R. 30-1 at 6.)

Jones indicated that he had been involved in investigating an Individual Taxpayer Identification Number ("ITIN") refund scheme in Milwaukee. (R. 30-1 at 5-6.) In these schemes, individuals residing in Mexico are paid a minimal amount of money to provide personal identifying information ("PII") to scheme participants, who use the information to secure an ITIN number and prepare a fraudulent tax return. The returns are filed with false wages derived from fraudulent W-2 forms, often using identical addresses for multiple distinct taxpayers. Fraudulently obtained tax refund checks are then cashed with the assistance of conspiring employees at banks or money service businesses. (R. 30-1 at 6.)

Jones detailed the results of his investigation into defendants' alleged participation in the scheme. In December 2013, agents conducted a garbage search at defendants' residence on S. 13th Street, locating numerous pieces of correspondence from the IRS, a receipt for the purchase of 2013 Form W2 laser printer sheets, a business card for a tax preparation service, and deposit slips from JP Morgan Chase. (R. 30-1 at 7 ¶ 16.)

---

[1]The affidavits in support of these applications were virtually identical.

In February 2014, agents interviewed a cooperating witness (CW#1) regarding his/her involvement in the ITIN tax refund scheme. CW#1 indicated that Ramirez and Dominguez reside at the S. 13th Street address, that Ramirez is known as "El Negro," and that Dominguez's real name is Hilda. CW#1 further stated that Ramirez provides CW#1 with treasury checks, and CW#1 is then paid a fee to cash them. CW#1 provided agents with a notebook used to record and track payments of tax refund checks. CW#1 indicated that entries marked "Negro" represented payments owed to Ramirez for tax refund checks cashed by CW#1. A review of the notebook indicated CW#1 had cashed about $27,000 in treasury checks for Ramirez. (R. 30-1 at 7-8 ¶ 17.)

In July 2014, agents executed a search warrant at the residence and check cashing business of CW#2, who was under investigation for cashing tax refund checks for ITIN tax fraud scheme participants. CW#2 agreed to cooperate and provided information on his and others' involvement in the ITIN tax fraud refund scheme. (R. 30-1 at 8 ¶ 18.) CW#2 indicated that Ramirez is from Peru and Dominguez from Mexico. He further stated that Ramirez receives PII documents from a source in Mexico, which are used to obtain an ITIN and prepare fraudulent tax returns. In order to receive larger refunds, Dominguez would add dependents on the return to increase the child tax credit. CW#2 believed the fraudulent returns were being created at Dominguez's business on W. Lincoln. (R. 30-1 at 8 ¶ 19.) During the search of CW#2's business, agents seized spreadsheets used to record the payments made to scheme participants. (R. 30-1 at 8-9 ¶ 20.) A worksheet labeled "Alberto14" represented federal income tax refund checks presented to CW#2 by Ramirez. (R. 30-1 at 9-10.) Jones indicated that he reviewed a sample of the tax return data associated with the tax refunds in this chart, which had the characteristics of an ITIN tax fraud scheme. (R. 30-1 at 10 ¶ 23.) Jones also

4

conducted an analysis of the entries labeled "Alberto" and "Alberto Peru" on the spreadsheets, which revealed that from January 2013 to June 2014 Ramirez presented CW#2 approximately $1.1 million in tax refund checks for cashing. (R. 30-1 at 10-11 ¶ 27 .)

In December 2015, agents executed search warrants at business and residence addresses associated with Soraida Nunez, who was also under criminal investigation. Shortly after the warrants were executed, Nunez apparently fled to Mexico. In January 2016, agents received a letter purportedly from Nunez, in which she described her involvement in the tax fraud scheme. She also provided a list of people in Milwaukee committing ITIN fraud, which included defendants. The letter also stated defendants operate a "tax business" on 11th and Lincoln. (R. 30-1 at 11 ¶ 28.)

In March 2016, an anonymous citizen walked into the IRS office on Rockford, IL, and provided information about Ramirez. The citizen stated that Ramirez was creating "ghost" ITIN numbers and using then to file tax returns to receive refunds. The citizen indicated that Ramirez cashed the checks in Illinois, Wisconsin, and New York, and lived in Milwaukee with his wife Ana Delia. The citizen further stated that "Ramirez was bragging recently to a group of people he was socializing with, including the anonymous citizen, that he has over $200,000 in cash stored in his house from the refund scheme." (R. 30-1 at 11 ¶ 29.)

In June 2016, Jones debriefed another cooperating witness, CW#3, who had been arrested for related criminal conduct and agreed to cooperate and provide information about his/her involvement, and that of others, in the ITIN tax refund scheme occurring in Milwaukee. CW#3 had been involved for about three years and had been responsible for generating $1.2 million in fraudulently obtained tax refunds. (R. 30-1 at 11-12 ¶ 30.) CW#3 indicated that in October 2013 he sold Dominguez ITIN documents for 15-20 families for $1600 per family;

Dominguez paid CW#3 $32,000 cash for the documents. (R. 30-1 at 12 ¶ 31.) CW#3 further stated that Ramirez and Dominguez own a "jewelry" store on Lincoln Ave. In 2014, CW#3 went inside the business on several occasions. In the back office, CW#3 observed a computer, W-2 forms, and ITIN documents, and Ramirez told CW#3 the business is used to receive tax refund checks. (R. 30-1 at 12 ¶ 32). Ramirez also cashed fraudulently obtained tax refund checks for CW#3. In October 2014, CW#3 needed a check cashing source since CW#2's business was closed. Ramirez contacted CW#3 and other scheme participants about cashing checks. On two occasions, CW#3 gave Ramirez checks to cash, in the amounts of $32,000 and $21,000 respectively. (R. 30-1 at 12 ¶ 33.)

Finally, Jones averred that he had a query performed for all tax returns submitted to the IRS for the period January 2013 to March 2017 using the W. Lincoln address, which revealed 260 returns with $790,000 in claimed refunds. (R. 30-1 at 12-13 ¶ 34.) A similar query for the S. 13th Street duplex revealed a total of 63 returns with $227,000 in claimed refunds. (R. 30-1 at 13 ¶¶ 35-36.) Jones indicated that a review of these returns showed characteristics of ITIN fraud. (R. 30-1 at 13.)

The magistrate judge issued the warrants, which agents executed on May 23, 2017. During the search of the residence, agents located a lease agreement for a storage unit rented in the names of two other individuals. Jones interviewed these two people, one of whom said that Dominguez asked him to rent the unit in his name. He further indicated that he had never been inside the unit or made a payment for it. Jones averred that other scheme participants had also rented storage units in nominee names for the purpose of concealing documents and proceeds, and a previous search of these units revealed fraudulent tax returns and about $1.5 million in cash. (R. 30-3 at 10.) Based on this and the information set forth in the previous

6

affidavits, Jones applied for a warrant to search the storage unit, which the magistrate judge also issued on May 23, 2017.² (R. 30-3 at 1.)

I agree with the reviewing magistrate judge that these affidavits provided a substantial basis for issuance of the warrants. First, Jones obtained detailed, specific, first-hand information from three cooperating witnesses detailing defendants' participation in the refund scheme. See United States v. Johnson, 289 F.3d 1034, 1039 (7th Cir. 2002) ("Foremost in our analysis is the fact that the CI observed first-hand the defendant's illegal conduct, and we have often repeated that first-hand observations by a CI support a finding of reliability.").

Second, while Jones did not indicate whether these cooperators had previously provided reliable information to law enforcement, the fact that they spoke against their own penal interest enhanced their credibility. See United States v. Olson, 408 F.3d 366, 371 (7th Cir. 2005) (noting that a statement made against penal interest "carries with it a presumption of reliability"). The cooperating witness statements also corroborated each other, and Jones obtained from the cooperators documents supporting their claims: CW#1 provided a notebook used to record and track payments of tax refund checks, which showed that CW#1 had cashed about $27,000 in treasury checks for Ramirez; and agents seized from CW#2 spreadsheets which tracked the payments made to scheme participants. The letter from Nunez and the anonymous citizen's tip, which also tied defendants' to the tax fraud scheme, provided further support for the application.

Finally, agents undertook efforts to independently corroborate the cooperators'

---

²The affidavit in support of the application to search the storage unit was identical to the previous affidavits, except for the additional information set forth in the text. Defendants argue that this additional information was derived from the illegal search of the residence and thus constitutes fruit of the poisonous tree. (R. 26 at 2, 21-22; R. 30 at 2.)

7

allegations, conducting a garbage search at defendants' residence, which revealed numerous pieces of correspondence from the IRS and a receipt for the purchase of Form W2 laser printer sheets, and reviewing the hundreds of tax returns associated with defendants' residence and business addresses, which Jones believed showed characteristics of ITIN fraud. The issuing magistrate could reasonably question the legitimacy of hundreds of tax returns being associated with a residential duplex and a business not involved in tax preparation.

**III.**

In his objections, Ramirez first seizes upon the magistrate judge's statement that none of the information provided by the informants and tipsters, standing alone, would have sufficed, but considered together this evidence supported a fair probability of criminal activity. (R. 39 at 6.) This is simply a recognition of the proper standard of review: "Rather than viewing bits and pieces of a probable cause showing in isolation, the court must focus on all the facts presented to the magistrate." United States v. Markling, 7 F.3d 1309, 1317 (7th Cir. 1993).

Defendants primarily argue that the information from the cooperators was stale: CW#1 spoke to agents 39 months before the warrant applications, CW#2 34 months before, and CW#3 11 months before. (R. 39 at 7-8; R. 40 at 2.) While passage of time is a factor, courts have found it far less important when the criminal activity is of a protracted and continuous nature, see, e.g., United States v. Ninety-Two Thousand Four Hundred Twenty-Two Dollars & Fifty-Seven Cents, 307 F.3d 137, 148 (3d Cir. 2002), as alleged here, and where the police seek business or financial records, which are likely to be kept for long periods of time, as were also sought here. See, e.g., United States v. Farmer, 370 F.3d 435, 439-40 (4th Cir. 2004)

(collecting cases).³ Agent Jones averred, based on his training and experience, that individuals involved in these kinds of schemes normally keep such records for "extended periods of time" (R. 30-1 at 2), and he in fact obtained from other participants records related to this particular scheme, which had actually been maintained for an extended period of time (R. 30-1 at 8-10).

Defendants also challenge the reliability of cooperating witnesses who were involved in criminal activity themselves (R. 39 at 7); they further complain that Jones provided no details that would have allowed the magistrate to assess the cooperators' reliability and basis of knowledge (R. 40 at 2). Jones disclosed the cooperators' involvement in tax fraud in the applications; as Jones explained, the cooperators had knowledge of defendants' alleged criminal activity because they participated in it together. Defendants make no claim that Jones

---

³Dominguez faults the magistrate judge for citing a child pornography case, United States v. Seiver, 692 F.3d 774 (7th Cir. 2012), noting that once they get their hands on such material offenders are not likely to discard it. (R. 40 at 3.) However, the magistrate judge also cited United States v. Floyd, 740 F.3d 22, 34 (1st Cir. 2014), which held that: "Business records, as a class, are repositories of historical facts and, therefore, are largely immune from claims of staleness." Dominguez cites no authority for her claim that only computer-related crimes or digital evidence are subject to the standard set forth in Seiver and Floyd. (R. 40 at 3-4.) In reply, Dominguez attempts to distinguish her case from United States v. Richards, No. 14-CR-81, 2015 U.S. Dist. LEXIS 5783 (E.D. Wis. Jan. 19, 2015), which the government cited in its response. (R. 43 at 1-2, 5.) She contends that, unlike the defendant in that case, there is no evidence that she had a long-standing, established business for which records would be considered "business records." (R. 44 at 2-3.) But the "business" at issue here is not the "jewelry" store located on Lincoln Avenue (R. 30-1 at 12 ¶ 32); it is the tax fraud "business" defendants allegedly operated. CW#3 advised Agent Jones during a debrief that he went inside the store on Lincoln on several occasions, and that in the back office area he saw a computer, W-2 forms, and ITIN documents. "Ramirez also told CW#3 the business is used to receive tax refund checks." (R. 30-1 at 12 ¶ 32.) Finally, Dominguez complains that at times the magistrate judge conflated the cooperators' individual interactions with her and Ramirez with joint interactions with both defendants. (R. 40 at 2-3.) However, Dominguez develops no argument that the affidavit established probable for Ramirez but not her (or her business). The cooperators spoke about both defendants' involvement in criminal activity. For instance, CW#2 indicated that "Dominguez would add dependents on the return to increase the [child tax credit]," and that he "believed the fraudulent returns were being created at Dominguez's business" on Lincoln. (R. 30-1 at 8 ¶ 19.)

9

withheld from the issuing magistrate important information regarding the cooperators' credibility. And, the cooperators' admission of criminal activity can be seen as enhancing their credibility. See United States v. Harris, 403 U.S. 573, 583 (1971) ("Admissions of crime, like admissions against proprietary interests, carry their own indicia of credibility – sufficient at least to support a finding of probable cause to search.").

Defendants note that the fugitive letter writer, Nunez, was also the subject of a criminal tax investigation (R. 39 at 8), but Jones also revealed these facts to the issuing judge. Defendants also contend that the affidavit provides no basis for evaluating the credibility of the anonymous tipster. (R. 39 at 8.) No one argues that this tip alone would support a warrant, but it surely provides further corroboration for the other information; the tipster personally heard Ramirez bragging about the amount of cash he had stored in his house from the refund scheme.

Defendants acknowledge that agents performed a query for all tax returns filed between January 2013 and March 2017 using their addresses. However, they complain that Jones did specify when within that period the returns were submitted; perhaps all of those returns dated from 2013 and 2014, again raising a staleness concern. (R. 39 at 9; R. 40 at 2.) But this again assumes that the mere passage of time will defeat probable cause to search for financial records. See United States v. McManus, 719 F.2d 1395, 1400-01 (6th Cir. 1983) (noting that old business or financial records could reasonably be expected to be found at the defendant's home or place of business, as such records are reasonably expected to be kept there for long periods of time). Given the number of returns involved – 260 for the business and a total of 63 for the duplex – the issuing magistrate could reasonably conclude that evidence of criminal

10

activity would be found at these locations.[4]

Defendants conclude that the agents could have done much more to corroborate and update the stale information they received. (R. 39 at 9.) That is not the test. See United States v. McKinney, 143 F.3d 325, 329 (7th Cir. 1998) ("While police can always do more to boost reliability, a probable cause determination does not require the same amount of certainty as a guilty verdict. We require only a reasonable probability that evidence of a crime can be found at a certain location.").

In their objections, defendants say little about good faith, which the magistrate judge applied in the alternative. They indicate that, given the staleness of the information, the questionable credibility of the informants, and the minimal investigation done by the agents, it is evident that the magistrate did not perform his neutral and detached function. (R. 39 at 10.) Even if the affidavits were weak, such that the magistrate should have declined to issue the warrants, there is no basis for concluding that he simply rubber-stamped the applications. See

---

[4]With regard to the business on W. Lincoln Ave., CW#2 indicated that the fraudulent returns were being created there. (R. 30-1 at 8 ¶ 19.) CW#3 indicated that defendants own a jewelry store on Lincoln Ave., that he saw documents related to the ITIN scheme in the office there, and that Ramirez said the business is used to receive tax refund checks. (R. 30-1 at 12 ¶ 32.) Jones confirmed that Dominguez is the registered agent for the business known as "Novedadas Ana" located at that address; he also conducted surveillance of the building, noting that the building has a sign "Novedadas Ana." The building has no signs or identifiers indicating a tax preparation business. (R. 30-1 at 6-7 ¶ 15.) Finally, IRS records showed that, although it was not a tax business, 260 returns were filed using this address. (R. 30-1 at 13 ¶ 34.) With regard to the duplex on S. 13th Street, agents pulled garbage finding indicia of tax fraud (R. 30-1 at 7 ¶ 16); CW#1 indicated defendants live there (R. 30-1 at 7-8 ¶ 17); agents checked property records, which confirmed that defendants' own the building (R. 30-1 at 6 ¶ 14); the anonymous tipster related Ramirez's boast of $200,00 in cash stored in the house (R. 30-1 at 11 ¶ 29); and the IRS received a total of 63 tax returns for this address in a roughly four year period (R. 30-1 at 13). Contrary to defendants' claim (R. 44 at 3), the affidavits established a sufficient nexus between the alleged tax fraud and these two locations. And, because the warrants for the residence and business were supported by probable cause, there is no basis for applying the fruit of the poisonous tree doctrine to the storage unit search.

11

United States v. Koerth, 312 F.3d 862, 869 (7th Cir. 2002) ("[W]e have difficulty understanding how a defendant can establish that the trial judge acted as a rubber stamp in the absence of evidence detailing the impropriety or inadequacy of the warrant application proceedings as well as the type of interaction (or lack thereof) between the judge and the officers."). Defendants cite no case finding a materially similar affidavit insufficient. See id. ("[W]e will admit the evidence unless: (1) courts have clearly held that a materially similar affidavit previously failed to establish probable cause under facts that were indistinguishable from those presented in the case at hand; or (2) the affidavit is so plainly deficient that any reasonably well-trained officer would have known that his affidavit failed to establish probable cause and that he should not have applied for the warrant.") (internal quote marks omitted). Nor do they contend that Jones misled the magistrate. The good faith exception would apply, even if the warrants were deficient.

**IV.**

**THEREFORE, IT IS ORDERED** that the magistrate judge's recommendation (R. 37) is adopted, and defendants' motions to suppress (R. 26, 30) are denied.

Dated at Milwaukee, Wisconsin, this 11th day of October, 2018.

/s Lynn Adelman
LYNN ADELMAN
District Judge